Owen **WILLIAMS**, Employee, Appellant.

v.

S. N. **LONG WAREHOUSE COMPANY**, Employer, and Consolidated Underwriters, Insurer, Respondents.

No. 32595.

St. Louis Court of Appeals.

Missouri.

March 19, 1968.

Quinn & Quinn, Robert F. Neely, Robert L. Weise, Morris B. Kessler, St. Louis, for appellant.

Luke, Cunliff, Wilson, Herr, Chavaux & McCluggage, St. Louis, for respondents.

RUDDY, Judge.

This is an appeal by an employee of S. N. Long Warehouse Company from a judgment of the Circuit Court of the City of St. Louis affirming an award of the Industrial Commission denying compensation. The Industrial Commission had affirmed the award of the Referee denying compensation on the ground that employee's claim had not been filed within the time prescribed by law.

Employee's claim was filed October 1, 1962 in which he alleged the accident took place "about November, 1961." Later, he filed an amended claim in which he alleged the accident took place between the "1st & 10th of Sept. 1960." It was admitted by the employer and insurer at the hearing before the Referee that employee had an accident between September 1 and September 10, 1960; however, they alleged in their answer that the claim was barred by the Statute of Limitations. At the hearing employer and insurer denied that any medical aid or treatment had been furnished employee by them.

Employee, sixty years of age when the hearing was held, was married. He was employed by S. N. Long Warehouse Company for five years prior to the accident and has always done the same kind of work, namely, filling orders, loading and unloading boxcars and trailers. He described his work as that of a common laborer. At the time of the accident employee was working in a boxcar getting ready to unload one hundred pound sacks of material. He was one of three men performing this work. Present on the occasion was Stanley Fischer, employee's boss. Before unloading the one hundred pound sacks it was necessary to remove some framing or cribbing which held these sacks in place inside the boxcar. Employee was in the process of removing this framing when the accident occurred. Employee said that he started to pull up the bottom rail or divider which seemed to be on the floor and started to "pull it out" when the divider and eight or ten one hundred pound sacks fell in his direction and came forward and fell on him pinning him down on the floor of the car under the divider and the sacks. He said he was thrown "Right straight back on my back." He went "Right down on the box car floor." He was not able to move. One of his fellow employees removed the sacks and the divider. Employee testified that as soon as he got up on his feet, "I told Mr. Fischer it hurt me. * * * I told Mr. Fischer it hurt my back." Fischer responded by telling employee, "it didn't hurt you, get up there and go to work." The fellow employee who pulled the sacks off of employee testified that when employee got up off of the floor, he said, "I hurt my back." The aforesaid accident took place before Labor Day in the month of September, 1960. Employee said he knew it was before Labor Day because he had planned to take an automobile trip to visit his father at Kennett, Missouri on Labor Day, but did not go because his back hurt him and he could not drive. Employee testified that up to the time of the accident he was in perfect health and was not under the care of a physician. He said he never had a backache before the accident and that he never had any weakness or limitation of motion in the back before the sacks fell on him. In 1955 or 1956 he sustained a broken right leg which he said was in good condition at the time of the instant accident. The accident happened in the afternoon. Employee went back to work about five minutes after he got up from the floor of the boxcar. Thereafter, he worked about three hours on that day. After he got up off of the floor he had pain in his back. He said it was "Just about like I had a pulled muscle or a sprained back." He said he had pains the rest of the day. At home that evening he had pain and discomfort

in his back and took aspirin to relieve the pain. He did not go to a doctor that evening. He returned to work the next day and continued to have pain and discomfort in his back. He told the two men he was working with that his back still hurt but he had no conversation with Fischer. He continued to have pain in his back until September 20th (1960) when he went to see Doctor Leroy Ellison, a physician. He said his reason for going to Doctor Ellison was because of the pain and discomfort in his back. He told Doctor Ellison it "Felt like I had a sprained back or pulled nerve." Prior to going to Doctor Ellison he told his boss, Stanley Fischer, about the pain in his back and asked the boss to send him to the company doctor. The only response he received from Fischer was "I will see about it." He said Fischer did nothing more about it. On his first visit to the doctor, employee was given a shot to relax the muscles and some pills for the pain and salve to rub on his back. The employee returned to Doctor Ellison about five weeks later at which time he complained about a cold and also told the doctor that his back still hurt a little. The doctor gave him some pills for his back. Between the first and second visit to Doctor Ellison employee told Fischer that his back continued to hurt and he said he asked Fischer three or four times to send him to the company doctor. Each time Fischer would say, "I will see about it." But employee heard no more from Fischer. During all of this time the employee continued to do the same kind of work for the employer. He said he did not have pain every day. Employee said that the pain he experienced, between the time of the accident and the second visit to Doctor Ellison, was a dull pain from his belt down. When asked in what part of his back he had the pain, he answered, "Kind of in the center but it went down in my left leg." He did not go back to Doctor Ellison after the second visit. He said Doctor Ellison did not have any x-ray pictures taken of his back. Employee when asked why he went to Doctor Ellison said it was because his back was

bad enough that he needed medical treatment. Between the first and second visit to Doctor Ellison his back did not hurt as much; however, he said it still hurt enough to cause him to go back to the doctor for the second treatment. The back got "some better" along about 1961 but he said he continued to ask his boss on numerous occasions to send him to a doctor. He was asked, "In other words, you did want to go to the doctor during that period. A. Yes, sir." He said his back was hurting him enough that he wanted to go to a doctor. In his direct examination employee said he had pain down his leg when he visited Doctor Ellison; however, in his cross examination he said he did not have pain down his leg on the occasion of his visit. He said his pain began in his leg in January of 1962. Plaintiff did admit that when he visited the Labor Health Institute in January of 1962 he told the doctor that he had backache radiating down into his left leg for a half a year before that time. In another part of his testimony, during cross examination, he said he did not tell the doctor at the Labor Health Institute that he had leg pain for a year and a half prior to the visit. He said he told him the back and hip pained him but not the leg.

Employee in his direct examination said that from the time of the accident until January of 1962, when he went to the Labor Health Institute, there were times when he did not have any pain in his back and leg and there were other times when he did have pain. In his cross examination when he was asked about his back condition between the time he last saw Doctor Ellison and the time he went to the Labor Health Institute in January of 1962, he said, "it got worser." He continued to work during all of this time telling a representative of the insurance company that "It was hurting me but I did (work) because I had to." Between the time he last saw Doctor Ellison and the time he went to the Labor Health Institute in January of 1962 he talked to Fischer about the pain in his back. He asked Fischer six to eight times to send him to the company doctor. He continued

to get the same response from Fischer, "I will see about it." Fischer never did send him to the company doctor. In September 1961 employee went to the Labor Health Institute to have some teeth pulled. On this first visit he had a physical examination and on this occasion he complained about his left hip, stating it was hurting him. He was not having pain in his back at that time. Employee admitted that neither Fischer nor anyone else from the company sent him out to the Labor Health Institute.

On a date the employee could not recall he went in to see Mr. Don Long who appeared to be an official of the employer. He told Long about his condition. He told Long he wanted to fill out a complaint. Long told him he would see him after dinner: employee signed no paper, he did not see Long again and Long did not send him to a doctor. Employee told Fischer that he was going to the Labor Health Institute for his injury and while going there employee asked Fischer about medical treatment three or four times.

Employee said the Labor Health Institute was an organization that was connected with the truck drivers union and the warehousemen's union. Employee indicated that "something" was taken out of his paycheck every month, pursuant to the union contract, for the Labor Health Institute benefit. A supervisor of the medical records of the Labor Health Institute described the organization as " * * * a nonprofit-group of physicians who render medical care to members of Local 688, whose employer pays into this group." The above is the only testimony which describes the relationship of the employer and the employee to the Labor Health Institute.

Employee in his direct examination testified that he first noticed a pain going down his leg in January of 1962 and that he could not recall any pain down his leg before that. This testimony is contrary to other testimony given by employee during his direct examination, wherein he said there were times when he did have pain in his back and leg. He admitted that he had pain in his hip before January 1962. In January 1962 he went to the Labor Health Institute complaining about his back and leg. At the Institute x-ray pictures were taken of his back and he was given some medication. He said his back was getting worse and that he would lay off from work to go out to the Labor Health Institute. He was first treated at the Institute by Doctor Rifkin who prescribed a back brace, which employee said seemed to help but was just a temporary help. Again, explaining the pain he was experiencing at the time he was going to the Labor Health Institute, he said it was a different kind of pain, stating, "It was further down in my leg. * * * Plumb down to the toes.". After January 1962 he went to the Labor Health Institute almost every week. The pain was affecting his ability to walk. He said he "couldn't hardly go." On one occasion he saw Doctor Tureen, who, after examination of employee, ordered him into the Firmin Desloge Hospital. This took place in September of 1962. In August of 1962, prior to going to the hospital, his back and his leg were giving him considerable trouble and he decided to consult Doctor Ullrich, a Chiropractor. He saw the Chiropractor on five occasions. On each occasion he laid off from work. At the time he was seeing the Chiropractor he told Fischer that he wanted to see the company doctor. It was then that Fischer told him to see Mr. Don Long, which he did. The result of this visit has been stated heretofore. Employee said the Chiropractor "worked on my back." However, the treatments given by the Chiropractor did not relieve the pain. Sometime after employee obtained his back brace his back condition got so bad he had to sleep on the floor. He said that Doctor Rifkin told him to sleep on the floor. When employee was asked why he went to the Labor Health Institute, he said, "I was afraid it was getting worse in January, 1962. He said the pain was running down into his leg and his leg got to where it did not have any feeling. After employee entered the

Firmin Desloge Hospital he was placed under the care and attention of Doctor Nash and Doctor Edmund A. Smolik. While in the hospital a lumbar laminectomy for a herniated intervertebral disc was performed by Doctor Smolik. Employee remained in the hospital for four weeks and at home for sometime thereafter. He thought Doctor Smolik permitted him to return to work the following November. He said the operation relieved the pain in his leg but he continued to have some pain in his back. After returning to his employment he worked regularly and did not miss any more time from his work on account of the back injury.

In employee's cross examination he admitted that he told Doctor Smolik, when giving him a history of his case, that at the time of the accident he had immediate pain in his low back, but he denied telling Doctor Smolik that two months after the accident he first experienced left leg pain. While employee was in the hospital he instructed his wife to file his claim for compensation with the compensation commission. As noted heretofore, the first claim which was filed by his wife, showed that the injury occurred in November 1961.

Employee introduced into evidence parts of the medical records of the Labor Health Institute. Some of the statements material to the issues follow: "January 27, 1962 * * * Lumbar back ache radiating into left hip for half year. * * * Trouble started on his job with a back strain. * * * Back negative to examination. X-ray and refer orthopedic." Entry of February 2, 1962, "Orthopedic. Doctor Rifkin. Patient enters complaining that his back has been bothering him for a year and a half, going into his left hip and down his leg. * * * Tenderness in left lumbo-sacral region. Neurological is negative. X-ray taken by Dr. Tosic shows some hypertrophic arthritic changes and narrowing L4–L5–S1 interspaces. Patient apparently has a lumbo-sacral back strain with aggravation of hypertrophic arthritis. I do not feel it is a disc syndrome. * * *"

Entry of February 16 under orthopedic, Doctor Rifkin: "Patient returns, shows no improvement. Patient to get lumbo-sacral back support." Entry of June 5, 1962, " * * * Dr. Rifkin, Patient returns. Back still bothering him with pain going down the posterior aspect of left thigh. Has fairly marked rigidity. * * *" Entry of September 10, 1962, "* * * Doctor Cohen. * * * Patient returned because of persistent ache in the lower back and also pain in the left lower extremity posteriorly, the latter being the site of very marked tenderness and discomfort * * * Patient obviously walks with a limp and while he has greatest discomfort bonewise in the sacral-iliac area, one cannot help being impressed with the report of lumbo-sacral spine which indicates narrowing of L4–L5–S1 regions with bony sclerosis indicating degeneration of disc possibly in the opinion of the roentgenologist. At the same time, one wonders about the presence of a disc being extruded or herniated. * * *" Because of these findings Doctor Cohen referred employee for a neurological examination to Doctor Tureen. Doctor Tureen recommended employee for entry in the Firmin Desloge Hospital for a myelogram and possible surgery. The records of the Firmin Desloge Hospital introduced in evidence by employee show that the myelogram " * * * revealed constant filling defect at the L5, S1 interspace on the left. In addition, there was some central, anterior, filling defect suggestive of osteoarthritic processes at the L4, L5 interspace." An entry of September 25, 1962 showed " * * * Pre-operative diagnosis: Herniated intervertebral disc between L5 and S1. Post-operative diagnosis: Same. Operation: Lumbar laminectomy for herniated intervertebral disc. * * * The dura was then displaced medially and a nubbin of hard, degenerated disc was present under the nerve root * * *. No nuclear material was obtained because this was an entirely degenerated process. * * *" The records of the Labor Health Institute show that part of the Firmin Desloge Hospital expenses was

paid by the institute and the balance of said expenses was paid by the employee.

Doctor Leroy E. Ellison was produced as a witness by the employee. Doctor Ellison, a general practitioner testified that he first saw employee on September 20, 1960. At that time employee complained that his back was bothering him and that he was coughing. He said the employee explained the circumstances of the accident in the boxcar and that he complained of pain in the left hip—in the left sacro-iliac region which he describes as a higher part of the hip area. There was no complaint of pain in the left leg. His examination of employee showed a left sacral-iliac strain with swelling and tenderness. He had employee bend his body in different maneuvers and positions on the table but he did not perform a straight-leg raising test. He said he gave him a hypodermic injection of ACTH, which was to relax the musculature and joints and he prescribed Myoflex, which he described as a penetrating ointment.

On the occasion of the first visit Doctor Ellison did not have any x-rays made. He again saw the employee on October 29, 1960. He did not remember whether he made an examination of the employee's back on that visit, but he did recall treating employee for a cold. When Doctor Ellison was asked in his cross examination if he suggested x-rays, he answered, "I usually do when there is pretty severe pain, because the ordinary x-ray will give fractures and things that way. We then take special x-rays for special things." "Q. Was it your testimony, doctor, this man's back was severely enough injured and he had severe enough complaints and symptoms at the time you saw him on September 20, that you thought x-rays would be desirable? A. We quite often suggest x-rays when something falls on the back or things falling that way. Q. Is it your recollection you did that in this case? A. I think I did."

Doctor William A. Stephens, who specialized in orthopedic surgery, stated that he saw employee September 25, 1963 for the purpose of evaluating the injury to the lower back. He described the complaints made to him by the employee and said there was no longer any referred pain into the lower extremities and there were no complaints of weakness of the extremities or of numbness. He made a complete examination of employee and took some x-rays of his back. We see no need to discuss his testimony concerning his examination and interpretation of the x-ray pictures taken. In response to a long hypothetical question propounded to him by employee's counsel, Doctor Stephens testified that there was a causal connection between the employee's symptoms and the findings disclosed by his examination and x-ray pictures and the accident of September 1960. Employee when giving to Doctor Stephens a history of the accident and subsequent pain and discomfort told Doctor Stephens that subsequent to the accident he experienced progressive low back pain and eventual radiation of pain into the left lower extremity; that he saw Doctor Leroy Ellison on September 20, 1960 who examined him and prescribed medication; that he again saw Doctor Ellison on October 29, 1960 and that the low back pain persisted and was aggravated by heavy lifting and was quite severe at night requiring him to sleep on the floor; that thereafter he applied to the Labor Health Institute for treatment of his back condition.

Doctor Edmund A. Smolik, a witness produced by the employer and insurer, testified that he is a neurosurgeon. He said he saw employee for the first time on September 20, 1962 at the Firmin Desloge Hospital. He said that employee told him that immediately after the accident he had immediate pain in his low back. " * * * He stated approximately two months later he first experienced left leg pain. He had had intermittant low back pain with left leg radiation in the interim. * * *"

Employee told him that he had various types of therapy which included heat, ointment, medicine and the wearing of a corset. Doctor Smolik made an examination of employee and it was his impression that employee probably had a ruptured intervertebral disc. A myelogram taken on September 21, 1962 disclosed "* * * a constant filling defect at the L5–S1 interspace on the left, and there was some slight central anterior filling defect which was consistent with other film of osteoarthritic process at this space." On September 25, 1962 he performed a laminectomy for a disc at L5–S1 interspace. In explaining what he found in the course of the operation, he said, "* * * we came upon a nubbin of hard degenerative disc under the nerve root * * *. We couldn't obtain any nuclear material because there was none there since this was entirely degenerative. Then we closed him up." A hypothetical question was propounded by employer's counsel which had for its purpose the asking of an opinion based upon reasonable medical certainty as to whether the accident that employee had had anything to do with producing the condition for which witness operated; he answered, "Based on the best I can assess this situation, I believe that the condition that I found at operation was present prior to his accident." He then said he thought that this condition had existed longer than two years. In his cross examination Doctor Smolik testified that he did quite a bit of neurological surgery for the Labor Health Institute. Again, in his cross examination he stated that the condition which he encountered during the operation existed prior to employee's injury in September 1960.

In its final award denying compensation the commission said, "The Commission finds controlling the recent decision of the Supreme Court of Missouri in the case of HUNDLEY vs. MATTHEWS HINSMAN COMPANY, 379 S.W.2d 489, and also DEES vs. RIVER FUEL COMPANY, 192 S.W.2d 635, l. c. 642."

We have stated the facts and some of the employee's testimony rather fully for a reason that will become obvious in our discussion of one of employee's contentions, which we think requires initial consideration. The primary issue for determination in this appeal is whether employee's claim is barred by the statute of limitations (Section 287.430 RSMo 1959 V.A.M.S., as amended by Laws of 1965), which provides that no proceeding for compensation shall be maintained unless a claim therefor is filed within one year after the injury, or in case payments have been made on account of the injury, within one year from the date of the last payment. The injury referred to in the aforesaid statute is a compensable injury, which has been defined as one which disables the employee, either totally or partially from the performance of his work, or requires medical or surgical treatment. When *either* of these conditions exists and is discoverable the right to compensation begins and likewise the limitation time begins. Hundley v. Matthews Hinsman Company, Mo., 379 S.W.2d 489, Dees v. Mississippi River Fuel Corp., Mo.App., 192 S.W.2d 635. However, there is nothing in the compensation act to indicate that the limitation period does not begin to run until such time as the most serious disability that the employee may sustain is ascertainable. Wheeler v. Missouri Pac. R. Co., 328 Mo. 888, 42 S.W.2d 579. The rule is that the claim must be filed within one year from the time it becomes reasonably discoverable and apparent that a compensable injury has been sustained. In numerous cases, among which are Hundley v. Matthews Hinsman Co., supra, Dees v. Mississippi River Fuel Corp., supra, and Crites v. Missouri Dry Dock & Repair Co., Mo. App., 348 S.W.2d 621, it was held that the determination of the date when it was reasonably discoverable that a compensable injury had been sustained is, largely, a question of fact.

As pointed out the claim should be filed within one year after a compensable

injury has been sustained by the employee and, should it transpire thereafter that the injury received has developed into a more serious injury, compensable in a different manner, the Commission should change the award, if any, previously made. Hundley v. Matthews Hinsman Co., supra. Provision is made in the Workmen's Compensation Act for compensation for temporary partial disability and for medical or surgical treatment, under which provisions the Commission is authorized, if need be, to award temporary compensation until such time as the exact nature of the injury is ascertained. Dees v. Mississippi River Fuel Corp., supra.

■ Other rules of law governing the extent and scope of our review in a Workmen's Compensation case are well known and need no citation of authorities. It is our duty to determine whether, upon the entire record, the Industrial Commission could have made the finding and award it did make. We cannot substitute our own judgment on the evidence for that of the Commission. We must affirm the award if it is supported by competent substantial evidence upon the whole record. In our review we may set aside the finding and award of the Commission only if they are clearly contrary to the overwhelming weight of the evidence. All the evidence and the reasonable inferences deducible therefrom, must be viewed in the light most favorable to the finding and award. We must disregard all opposing and all unfavorable evidence to the award and this is true even though the finding of the Commission, if to the contrary, would also have been supported by the evidence. The weight of the evidence and the credibility of the witnesses are for the Commission only. If the competent evidence or permissible inferences are conflicting the choice rests with the Commission and is conclusive upon this court. Where the finding of the ultimate facts must be made by a process of natural reasoning from the facts alone we may not disturb the Commission's finding.

In a point relied on by employee, which we think needs our initial consideration, employee contends that there is no conflict in the facts; that the evidence is undisputed and uncontradicted and for this reason there was no question of fact before the Commission to be decided by it and that the rules we have announced heretofore, namely, that the finding of fact made by the Commission within its power shall be conclusive on us and that we cannot substitute our own judgment on the evidence for that of the Commission, is not applicable. Employee contends that the conclusion and award of the Commission was arrived at by the application of rules of law, instead of by a process of natural reasoning from the facts alone and, therefore, the Commission's conclusion was one of law and is subject to review by this court, citing a number of authorities among which is the case of Merriman v. Ben Gutman Truck Service, Inc., Mo., 392 S.W. 2d 292, l. c. 296–297.

■ We are aware that awards of the Commission which are clearly the interpretation or the application of the law, as distinguished from a determination of facts, are not binding upon us and fall within our province of review and correction. Merriman v. Ben Gutman Truck Service, Inc., supra. We agree that there is no conflict as to some of the facts. We agree that the evidence as to the facts and circumstances of the accident and that an injury occurred are undisputed and uncontradicted and that in this regard there is no conflict in the evidence. However, there is material conflict as to those facts dealing with the primary issue in the case, namely, the time when the compensable nature of the employee's injury became reasonably discoverable and apparent. In regard to this issue there is conflict which called upon the use by the Commission of natural reasoning in order to resolve the conflict. We think the time when employee first noticed the pain in his left leg is important in determining when the compensable nature of his injury became rea-

sonably discoverable and apparent. In this respect employee contradicts himself. In his direct examination when he was asked to describe the pain he experienced between the time of the accident and the second visit to Doctor Ellison, he said, "Kind of in the center but it went down in my left leg." In his cross examination he denied that he had pain down his left leg during that time. Documentary evidence introduced by the employee contradicts some of his testimony as to when pain in his left leg began. In one part of his testimony he testified that it did not begin until January 1962; however, the Labor Health Institute records indicate that he told Doctor Rifkin on February 2, 1962 that his back had been bothering him for a year and a half, going into his left hip and down his leg. Doctor Smolik testified that employee told him that approximately two months after the accident he first experienced left leg pain, that he had intermittent low back pain with left leg radiation in the interim. Employee, in his testimony denied telling Doctor Smolik that he had left leg pain approximately two months after the accident. Employee's own examining doctor testified that employee told him that subsequent to the accident he experienced progressive low back pain and eventual radiation of pain into the left lower extremity. With such conflict in the record there is little question that the determination of the date when it was reasonably discoverable that a compensable injury had been sustained was a question of fact for the Commission.

█ Applying the rules governing our review we think the award of the Commission is supported by substantial competent evidence and should be affirmed. Obviously, if the compensable nature of employee's injury was reasonably discoverable and apparent to employee at some time prior to October 1, 1961, which was one year prior to the date employee filed his claim, he filed his claim too late. It is true that employee continued to work and lost no time from his employment until he started to visit the Labor Health Institute, but disability is not an indispensable element to the right to compensation. Gleason v. Titanium Pigment Co., Mo.App., 93 S.W.2d 1039, l. c. 1043. In addition to the payment of compensation for a compensable injury which causes either total or partial disability from the performance of work the Workmen's Compensation Act requires that the employer provide medical or surgical treatment to cure and relieve from the effects of the injury. As we have pointed out there need not be disability. If it becomes reasonably discoverable and apparent to the employee that he needs medical or surgical treatment the right to compensation begins and as we have said, likewise the limitation time begins. We think the evidence favorable to the award substantially shows that employee knew almost from the time of the accident that he required medical or surgical treatment.

A brief resume of the record evidence applicable to the period prior to October 1, 1961 amply demonstrates that employee, not only could reasonably have discovered the need for medical or surgical treatment, but knew he needed such treatment, The evidence favorable to the award shows that immediately following the accident employee complained of pain in his back. He said he had pain the rest of the day and had pain and discomfort the evening of the day of the accident. The following day he continued to have pain and discomfort in his back. He complained of the pain to two of the men who were working with him. He could not visit his father on Labor Day, which was a few days following the accident, because his back hurt him so badly he could not drive. He continued to have the pain in his back until September 20, 1960 when he went to see Doctor Ellison, seeking medical treatment. Prior to going to Doctor Ellison on the first visit he told his boss, Fischer, about the pain and asked Fischer to send him to the company doctor.

This of course shows his knowledge for a need of medical treatment. He saw the need to return to Doctor Ellison for a second treatment and at that time told the doctor that his back continued to hurt. During this same period he continued to ask Fischer to send him to the company doctor. He testified that between the time of the accident and his second visit to Doctor Ellison he had pain in his left leg. It will be recalled that it was the recollection of Doctor Ellison that he suggested to employee that he have x-rays taken. Employee did not follow through on this suggestion. When employee was asked why he went to see Doctor Ellison he said it was because he needed medical treatment. He admitted that he did want to go to a doctor during the early period of his injury and that he continued to ask his boss for medical treatment and for the services of a doctor. He said his back was hurting him enough that he wanted to go to a doctor. He admitted telling Doctor Rifkin on February 2, 1962 that he had backache radiating down his left leg for a half year before January of 1962. The records of the Labor Health Institute, introduced by employee, show that on February 2, 1962 he told Doctor Rifkin that his back had been bothering him for a year and a half, going into his left hip and down his leg. He testified that the pain gradually got so bad he had to sleep on the floor. After he saw Doctor Ellison he again asked his boss about ten or twelves times to send him to a doctor. These requests continued until January of 1962. These requests for medical treatment made to Fischer, his boss, continued while he was receiving treatment in the Labor Health Institute. He admitted telling Doctor Smolik that at the time of the accident he had immediate pain in his low back. Doctor Smolik testified that employee told him that immediately after the accident he had immediate pain in his low back and that two months later he experienced left leg pain. Doctor Stephen, employee's examining physician, testified that employee told him that subsequent to the accident he experi-

enced progressive low back pain and radiation of pain into the left lower extremity and that the pain was so severe at night that it required employee to sleep on the floor. We point out that Doctor Ellison thought employee's injury was of sufficient gravity as to require x-ray pictures. We think the aforesaid evidence, as stated, was sufficiently competent and substantial to support the finding and award of the Commission in believing that employee had sustained a relatively serious injury to his back in September 1960, which required him to seek medical attention at that time and to request medical attention periodically for the next year and a half as his condition gradually got worse. We think the evidence clearly shows that it was reasonably discoverable and apparent to the employee that he was in need of medical or surgical treatment as early as September 1960. He testified that he knew then that he needed medical treatment because of the severity of his pain in his back which radiated down into his left leg. At no time in employee's testimony did he say or suggest that he thought his injury was trivial. This type of evidence shows that the employee had actual knowledge of his need for medical or surgical treatment. At least, the seriousness of his injury and therefore its compensable nature was reasonably discoverable and apparent before one year prior to the filing of his claim and the Commission would be warranted in arriving at this conclusion.

Employee cites many cases in support of his right to compensation; however, it seems that his main reliance is on the case of Kostron v. American Packing Co., 227 Mo.App. 34, 45 S.W.2d 871. The Kostron case is readily distinguishable from the instant case. An explanation of the distinction between the Kostron case and the instant case may be found in the answer we gave in the case of Dees v. Mississippi River Fuel Corp., Mo.App., 192 S.W.2d 635, when referring to the Kostron case, we said, "the claimant considered his injury a trivial

matter * *." (l. c. 643) As we pointed out employee in the instant case at no time said or suggested that his injury was trivial. All of his testimony shows that the pain was severe from the very beginning, that it was in his back, in his hip and radiated down into his left leg. The Kostron case is of no help to employee in this case.

In the final point we take up for consideration employee claims that the admission of the employer and insurer and the evidence show that the employee had been furnished medical aid paid for by the employer to cure and relieve him for the effects of his injury within one year before the filing of his claim for compensation and points to the provision of Section 287.430 RSMo 1959, supra, which provides, that in case a payment has been made by the employer on account of the injury that employee may file his claim within one year from the date of the last payment. He contends that the employer herein made payments on account of the injury from January of 1962 until October of 1962 because of employee's treatment at the Labor Health Institute. The exact nature of the Labor Health Institute and how it is supported is not clear from the record. However, it does appear that employer pays something to the Labor Health Institute, but whether this is a contribution by the employer or merely a forwarding of the amount employee said was taken out of his paycheck every month, pursuant to the union contract, is not explained in the record. However, employee did admit that the Labor Health Institute was an organization that was connected with the truck drivers union and the warehousemen's union and we may assume from this that it is a union operated facility. Also, the Labor Health Institute records introduced by employee show that he paid part of the Firmin Desloge Hospital bill. There is nothing in the record to show that the Labor Health Institute is provided to take care of injuries arising out of and in the course of empolyee's employment. Employee's initial visit to the Labor Health

Institute was for the care of his teeth, which of course had nothing to do with his alleged injury. As employer points out the doctors at the Labor Health Institute were not those provided by the employer for compensable injuries and it will be remembered that employee while going to the Labor Health Institute and prior thereto constantly asked Fischer for the services of a company doctor. Assuming that the employer did make some contribution to the operation of the Labor Health Institute it seems clear that these contributions were not intended to be made pursuant to the Workmen's Compensation Act or to provide medical care for injuries which come within the scope of the act. We have pointed out that the employee makes contributions to the upkeep of the Labor Health Institute. Section 287.290 RSMo 1959, V.A.M.S. specifically provides that no part of the cost of the employer's compensation insurance shall be assessed against, collected from or paid by any employee. If the deductions made from the pay of the employee by the employer were for the purpose of providing him with medical benefits under the Workmen's Compensation Law such contributions would be in violation of the aforesaid statute. As pointed out by the employer Section 287.270 RSMo 1959 V.A.M.S. states that no insurance which the injured employee may have or benefits from any other source shall be considered in determining the employer's obligation to provide compensation payments and medical care. The Labor Health Institute is certainly an outside source.

 The compensation, medical aid and other benefits required by the Workmen's Compensation Law are, in the nature of obligations or payments due under a contract. Welborn v. Southern Equipment Co., Mo., 395 S.W.2d 119, l. c. 124. Under this contract, pursuant to the act, it is the duty of the employer to provide medical services when required. In the aforesaid Welborn case and in many other cases it has been said that when the employer *furnishes*

medical services to an injured employee that it constitutes a payment on account of injury which postpones the running of the period of limitation. Obviously, this calls for some act on the part of the employer of which he is aware and intends to perform. In the case of State ex rel. Saunders v. Missouri Workmen's Compensation Commission, 333 Mo. 691, 63 S.W.2d 67, the Supreme Court said, "* * * The provision for filing claims within six months (now one year) from the date of the last payment has reference to voluntary payment or payments under a temporary agreement. It could refer only to such payment. * *" Obviously, if the employer did not provide the treatments at the Labor Health Institute and was unaware of employee's treatments until after he had started them at the Labor Health Institute, the treatments could not be considered payments under the act. In 100 C.J.S. Workmen's Compensation Law, § 478, p. 401, it is said: "* * * In order to excuse late filing of, or extend the time for making, a claim, the facts must be such that it can reasonably be said that the employer was aware, or should have been aware, that he was making compensation payments. The intent with which the payments are made and received is of particular importance in determining whether they are in lieu of compensation. * * *" The payments on account of compensation must be intended by the employer to be such. In the cases of Sinclair Prairie Oil Co. v. Newport, 195 Okl. 521, 159 P.2d 726 and Stewart v. Industrial Commission, 236 Wis. 167, 294 N.W. 515, it was held that it is the real purpose for which such payments are made that governs, and that such purpose should be proven by showing knowledge, actual or imputed, and the intent, proven or inferable on the part of the employer. We conclude that the medical treatments received by employee through the Labor Health Institute were not payments by the employer on account of the injury and therefore did not toll the running of the statute of limitations. The contention of employee that employer admitted making the payments on account of the injury from

January of 1962 through October of 1962 has no merit.

The judgment of the circuit court sustaining the finding and award of the Industrial Commission is affirmed.

ANDERSON, P. J., and MICHAEL F. GODFREY, Special Judge, concur.