**Lynn H. STEGALL, Respondent,**

**v.**

**ST. JOSEPH LEAD COMPANY, Appellant.**

**No. 33824.**

St. Louis Court of Appeals,
Missouri.

Feb. 23, 1971.

Motion for Rehearing or to Transfer to Supreme Court Denied March 23, 1971.

Application to Transfer Denied May 10, 1971.

Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, Joseph H. Mueller, St. Louis, W. Oliver Rasch, Edward J. Bust, Bonne Terre, for defendant-appellant.

John J. Larsen, Jack Randall, St. Louis, for plaintiff-respondent.

DOWD, Judge.

This is a workmen's compensation case involving a claim by an employee against his employer and self-insurer for the occupational disease of lead intoxication. The employer by its answer denied the claim. At the hearing before the Referee the employer admitted inter alia that the employee had been exposed to lead dust and fumes during his employment but denied the employee sustained lead intoxication.

The Referee found in favor of the employee and awarded him compensation for permanent partial disability of 5% of the body as a whole which amounts to $940.00 for lead intoxication. Both employee and employer made application to the Industrial Commission for review of this award with

the employee contending that the award for permanent partial disability should be increased to 15% of the body as a whole and the employer contending that the award should be reversed. On review, the Industrial Commission affirmed the award of the Referee but increased the employee's permanent partial disability to 10% of the body as a whole.

On employer's appeal, the Circuit Court affirmed the final award of the Industrial Commission.

The employee testified at the hearing before the Referee as follows: He was 36 years old and had been employed by St. Joseph Lead Company for 12 years. In August of 1966 he had been working for about 5 years in the blast furnace department where the lead is smelted. His job was to charge the furnace with lead ore and lead welding and he was exposed to lead smoke. In August, 1966 he developed weakness, muscle cramps and stomach cramps. He was examined and treated for this condition by Dr. Emmett J. Senn, the plant doctor.

Dr. Senn took a blood count and told him the count was too high for him to be suffering from lead. He returned to the furnace work. He saw this doctor five or six times and about September 8, 1966 was given white pills. He was then transferred from the blast furnace department to yard work which is outside. After working in the yard for about three weeks, he had another blood test and was then told by his foreman to return to his job in the blast furnace. In July, 1967, he was transferred back to yard work for four weeks and was again taking the white pills. He was working in the blast furnace department at the time of the hearing.

Dr. Martin W. Davis examined him for the employer on January 26 and December 1, 1967. Dr. Harry Agress conducted an examination on behalf of the employee on July 18, 1967. His complaints to those doctors were that he had a lot of trouble with his joints, ankles, knees, fingers, elbows and occasionally trouble with his appetite. Some of the complaints which he had when he saw Dr. Senn had cleared up when he saw Doctors Davis and Agress, however, he still had "joint trouble" and he tired quickly. His complaints at the hearing were "all joints" and that he tired quicker than he should, his feet and hands get numb, and cramps in low part of the stomach.

On cross-examination, the employee stated that the trouble with his joints, appetite and stomach cramps developed about five months before August, 1966. Before going to Dr. Senn in September, 1966, he told his fellow workers about his symptoms. There were signs posted about the plant to the effect that muscular aches and pains, stomach cramps and loss of appetite are symptoms of lead poisoning. He was provided with a respirator which covers his nose and mouth. He wore it 89% of the time and wore it when he could see dust and smoke. He has lost no time from work from August, 1966 to the date of the hearing and his physical condition has remained the same for the year immediately preceding the hearing.

Dr. Agress' deposition was introduced for the employee. He confines his practice to internal medicine, specializing in hematology. An examination of a patient to determine if lead intoxication exists consists of a complete history, a physical examination, laboratory tests and an examination of the patient's records.

Dr. Agress' testimony was as follows. Common complaints of persons with lead intoxication involve the gastrointestinal system. Other common complaints are: cramping or pain in the abdomen, sometimes constipation; vague digestive disturbances and joint pains; and, complaints involving the central nervous system which involve headaches, insomnia and nervousness. There is another area of complaints usually related to blood counts and this complaint is usually one of weakness or ready fatigue.

He examined the employee on July 18, 1967 and obtained a lengthy history much of which is contained in the employee's testimony. The history includes the following information: The last time the employee saw Dr. Senn he was told he had lead poisoning. During the time he was assigned to the yard his joints got better and his ankle swelling diminished but when he went back on the blast furnace duty his joints stayed sore all the time. Since June, 1966 he felt sluggish and tired all the time. The sluggishness diminished during the period of yard work but became worse when he returned to the blast furnace. He made no complaints related to the gastrointestinal tract. He had headaches daily.

Dr. Agress' examination further showed: There was no lead line on the gums. The test for the red blood count and the white blood count showed them to be within normal limits. A reticulocyte count revealed 1.6 percent reticulocytes, an elevated count, some of which showed a very coarse basophilic stippling. A lead blood determination showed 74 micrograms of lead in 100 grams of blood. The average lead content of the blood of a normal person does not exceed 60 micrograms per 100 grams of blood.

Dr. Agress stated: "My diagnosis is that Mr. Stegall had chronic lead intoxication. * * * My opinion is that Mr. Stegall's lead intoxication was a direct result of his employment at the St. Joseph Lead Company." He stated his condition would either remain the same or may deteriorate. He was asked for his opinion as to the percentage of permanent partial disability the employee has sustained. He answered: "In my impression, Mr. Stegall has a fifteen percent disability."

On cross-examination, Dr. Agress testified that in his practice he had encountered about 15 cases of lead intoxication and in his opinion there are occasions when persons exposed to lead and who have symptoms of lead intoxication have fully and completely recovered. Based upon experi-

ments performed by Dr. Kehoe, of the Kettering Institute in Cincinnati, an individual exposed to lead in excessive amounts and then put in a relatively lead-free environment will take a minimum of three times the length of time to get rid of the lead in time element as it did for the exposure, i. e., if he is exposed for two years it will take him over six years to get rid of the lead.

Dr. Agress further testified on re-cross examination:

"Q Your physical examination was basically normal, everything appeared to be normal? A Yes.

"Q And the laboratory examination, with the exception of the reticulocyte count and the blood lead level was normal? A Yes, sir.

"Q * * * You estimate his disability at the present time as fifteen percent? A Yes, sir.

"Q Doctor, would you say that in the event this man is removed from this environment that his disability might change? A Yes, sir.

"Q And might it lessen? A Yes, sir.

"MR. MUELLER: Would it be fair to say that even though his disability might lessen—would you be able to state now with any degree of medical certainty whether or not there would be any permanent damage to his system as a result of the lead that you say he now has? A There may or may not be.

"Q All right. By that do I understand you to say you can't tell? A Yes, sir.

"Q Is there any way anyone could measure at the present time— A No, sir.

"Q — at the present time what this man's condition or what injury, if any, there would be to his system as a result of exposure to lead that you found at the

time of your examination? A This could only be an indirect assumption and this indirect assumption is based on the history of lead workers. It's been shown particularly in studies in Great Britain that men in occupations similar to Mr. Stegall have a lessened life expectancy and that this diminished life expectancy has been related either to the development of kidney trouble later in life or central nervous system disease, particularly involving blood vessels.

"Q Well, Doctor, it's not clearly understood, is it, what effect the lead has on the kidneys, would that be a fair statement or is that an incorrect statement? A The exact mechanism isn't understood but the fact lead can injure the kidneys is well documented."

The testimony of Dr. Davis in behalf of employer was presented by deposition. He testified in part as follows: He has treated many cases of lead intoxication. Every human being has some lead in the system. There is some difference of opinion as to what amount is considered normal, but nowadays the opinion is that anything up to 0.07 milligrams per hundred grams of blood is within normal limits. Usually people who have absorbed lead have abdominal pains, cramping in nature, associated with very marked constipation. They also can develop a foot drop with paralysis to the extensor muscles of the foot. They can develop anemia and headaches. Some people tolerate lead better than others. Lead is distributed throughout the body, but it becomes deposited in the bones, which it does not affect. Lead has a tendency to leave the body, but it is slow. After it is deposited in the bones, if the individual is removed from further exposure to lead, it gradually mobilizes into the blood and is excreted through the kidneys.

Dr. Davis examined the employee on January 26 and December 1, 1967. He prepared reports of those examinations, which reports by stipulation were made part of the deposition. The report of his first examination contains a lengthy history which includes these complaints and information: cramps in his legs, poor appetite, complaint of aching in his muscles and joints, particularly in his knees and elbows. He did have some swelling of his ankles. His joints will swell and get stiff, and that his fingers get stiff and don't grip well. He had been exposed to considerable smoke. He was treated for lead poisoning on September 8, 1966, but his present trouble really started about six months before. He said that he felt better since he was treated for lead poisoning, but still had similar complaints, particularly with aching pains in the large joints, in the knees, elbows and ankles. He did not feel tired or worn out, but becomes exhausted if he exerts himself very much. Occasionally he has had some low abdominal pain, and was moderately constipated. He did not complain of any cramps in his abdomen. Sometimes his legs go to sleep and his feet tingle. There was no evidence of a lead line. Laboratory examination: Blood lead level 57 micrograms % (Normal: up to 60 micrograms %). The doctor's conclusion was that the employee "* * * does not show any definite evidence of excessive lead absorption. His blood lead level is essentially normal. His blood counts are normal. The symptoms he had in September, 1966, were not typical of lead intoxication. I believe he is able to work at the present time."

The report of Dr. Davis' second examination recited in part: Laboratory data: morphology: few stippled cells present; blood lead level: 75 micrograms % (Normal: up to 60 micrograms %). In the summary and conclusions of this report, it is stated: "Mr. Lynn Stegall complains primarily of aching pains around the large joints of the extremities. There are no signs of lead neuropathy. He does not have typical symptoms or objective findings of lead intoxication. His blood lead level is slightly elevated, indicating past lead absorption. There is no evidence of lead intoxication at this time. I believe he is able to work at this time. I do not believe

that he has any permanent disability, related to his occupation."

Dr. Senn testified for the employer as follows. The classic signs of lead intoxication are: pallor, the metallic taste in the mouth, the lead line, abdominal cramps and chronic constipation. Painful joints have no relationship to lead. Other symptoms are: anemia, weakness, fatigue, loss of appetite and weight. The blood lead level of .065 milligrams percent was considered normal but that .085 up to .01 is permissible without any real effects but some individuals will show intoxication below those levels.

Dr. Senn first saw the employee on December 31, 1966 and his blood lead level was .052 milligrams percent. The employee made no complaint of abdominal cramps, constipation or loss of appetite. There was no lead line. In July, 1967 the employee had an elevation of blood lead level and his job was changed to yard work but he did not have classic complaints. He was put on chelate pills and returned to his regular job on August 30, 1967. He observed no physical changes in the employee's physical make-up attributable to lead and in his opinion the employee had no permanent disability.

Then while the case was on review before the commission, it appointed Dr. Harold J. Joseph as an impartial doctor to examine the employee under authority of Section 287.210(2) RSMo 1959, V.A.M.S.

Dr. Joseph examined the employee on May 14, 1969 and the commission ordered the report of his examination dated June 14, 1969 made part of the record for all purposes. The history obtained from the employee contained the following:

"* * * About one year ago he was treated with 'calcium pills' in the amount of eight tablets daily for four weeks. Since 1966 he has continued to feel weak generally wtih aching in his elbows, wrists, ankles and knees. * * *"

The laboratory report showed that a complete blood count was made and that the blood lead level was 30 Mcg. %. In the summary and conclusions of the report Dr. Joseph states:

"* * * Mr. Stegall has continued to work at the Herculaneum Division of the St. Joseph Lead Company being at least intermittently exposed to lead fumes. He has symptoms of the musculoskeletal system and gastrointestinal system. The symptoms of the musculoskeletal system are consistent with the diagnosis of chronic lead intoxication; however, the gastrointestinal symptoms are not. He has a blood lead level which is at the upper limits of normal for the technique used. It is my opinion that Mr. Stegall does in fact have symptoms referrable to chronic lead intoxication. I believe that his symptoms will persist as long as he is exposed to lead-containing fumes. I would estimate his disability currently at ten per cent."

As stated, the commission affirmed the Referee's award but increased the employee's permanent partial disability to 10% of the body and the Circuit Court affirmed the commission. Employer appeals.

■ The rules of law governing the extent and scope of our review in a workmen's compensation case are well established. It is our duty to determine whether upon the entire record, the Industrial Commission could have made the finding and award it did make. We cannot substitute our judgment on the evidence for that of the commission. We must affirm the award if it is supported by competent and substantial evidence upon the whole record. In our review, we may set aside the finding and award of the commission only if they are clearly contrary to the overwhelming weight of the evidence. All the evidence and the reasonable inferences deducible therefrom, must be viewed in the light most favorable to the finding and award. We must disregard all opposing and unfavorable evidence to the award and this is true even though the finding of the commission, if to the contrary, would also have been supported by the evidence. The

weight of the evidence and the credibility of the witnesses are for the commission only. If the competent evidence or permissible inferences are conflicting the choice rests with the commission and it is conclusive with this court. Dupree v. Yorkshire Cleaners, Inc., Mo.App., 454 S.W.2d 607, 610; Williams v. S. N. Long Warehouse Co., Mo.App., 426 S.W.2d 725, 733.

The employer contends that the final award is not supported by substantial and competent evidence. Employer further contends that the determination of the issue of whether the employee has any permanent partial disability was dependent upon expert medical testimony and that the medical evidence in the record does not support the award but on the contrary is opposed to the finding of the award. We disagree.

We believe that the award is supported by substantial and competent evidence. The evidence showed that the employee worked for this company for twelve years and in August, 1966 was working in the blast furnace department where the lead is smelted. He was exposed to lead smoke. He developed weakness, muscle cramps and stomach cramps. He had many of the symptoms which are common to lead intoxication. He was seen and treated five or six times by Dr. Senn, the plant doctor, who gave him pills to take for his condition. Twice he was transferred out of the blast furnace department to yard work; the last time was in July, 1967 when Dr. Senn found an elevation of the blood lead level.

Dr. Davis' second report showed that the employee's blood lead level was "75 micrograms % (normal: up to 60%)" and while Dr. Davis did state that "There is no evidence of lead intoxication" he also stated that the elevation of the blood lead level indicated a past lead absorption.

The award is supported by the medical testimony and medical conclusions of Dr. Agress and Dr. Joseph. Dr. Agress' examination showed that the employee's lead blood level was 74 micrograms of lead in 100 grams of blood with the normal being 60 micrograms per 100 grams of blood.

Based on a lengthy history and the tests given, Dr. Agress' medical conclusion was that the employee had chronic lead intoxication. In answer to the question of the percentage of the employee's permanent partial disability, Dr. Agress stated it was fifteen percent disability. Employer argues that Dr. Agress did not use the word "permanent" in his answer. The answer "fifteen percent disability" was in direct answer to a question which asked for the permanent partial disability of the employee. The question and answer are, of course, considered together and these words "permanent, partial disability" are incorporated in the doctor's answer.

The employer also contends that Dr. Agress' testimony was completely neutralized on cross-examination. We disagree. Dr. Agress' testimony on cross-examination must be considered as a whole. He was asked if the employee's disability might lessen if removed from this environment and he answered it might lessen. He was then asked "even though his disability might lessen" would there be any damage to his system as a result of lead. He answered "There may or may not be." Dr. Agress then explained that studies in Great Britain on the history of lead workers, in occupations similar to the employee's, showed a diminished life expectancy, the development later in life of kidney trouble and a central nervous system disease involving blood vessels. We do not believe Dr. Agress' testimony neutralized the medical opinion given on direct examination.

Dr. Joseph, who was appointed by the commission, stated in the conclusion of his report that the employee had symptoms referable to chronic lead intoxication and these symptoms would persist as long as he is exposed to lead containing fumes and the disability was estimated "currently at ten per cent." While it is true that the doctor used the word "currently" to describe the percentage of disability and did not use the phrase permanent partial disability to describe the disability, he did use the word "chronic" to describe the employee's lead intoxication. While the term "chronic"

does not connote permanency, the word "chronic" is defined in a medical dictionary as a condition "of long duration, denoting a disease of slow progress and long continuance." Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328, 334; Stedman's Medical Dictionary, 18th Rev. Ed., p. 283. However, this testimony, coupled with the testimony of the employee and the medical conclusions of Dr. Agress is competent and substantial evidence upon which to base the award.

We cannot disturb the findings of the commission based on an acceptance by it of medical conclusions which are in conflict wtih other medical conclusions unless the conclusions accepted were against the overwhelming weight of the evidence. Davidson v. Scullin Steel Company, Mo. App., 408 S.W.2d 171, 175[1]. We do not find the medical conclusions of Dr. Agress and Dr. Joseph contrary to the overwhelming weight of the evidence. The weight of the evidence and credibility of the witnesses were for the commission.

The judgment is affirmed.

BRADY, P. J., concurs.

WOLFE, J., not participating.